**21 MAG 8388**

Approved: _____
        ANDREW JONES
        Assistant United States Attorney

Before:   THE HONORABLE KEVIN NATHANIEL FOX
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -

ROBERT LENARD BOOTH,
   a/k/a "Trevor Nicholas,"

                   Defendant.

- - - - - - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 1349, and 1956(h)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

       BENEDICT CASTRO, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and charges as follows:

**COUNT ONE**

(Conspiracy to Commit Securities Fraud)

       1.   From at least in or about June 2019, up to and including at least in or about February 2021, in the Southern District of New York and elsewhere, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

       2.   It was a part and an object of the conspiracy that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Overt Acts

3. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. On or about February 12, 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant caused approximately $12,000 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

   b. On or about August 26, 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant caused approximately $109,975 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

   c. On or about September 10, 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant caused approximately $12,000 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

   d. On or about December 7, 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant caused approximately $95,985 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

   e. On or about December 10, 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant caused approximately $17,485 to be wired through a bank account in New York, New York, to a bank account in Glen Cove, New York.

(Title 18, United States Code, Section 371.)

**COUNT TWO**

(Conspiracy to Commit Wire Fraud)

4.     From at least in or about June 2019, up to and including at least in or about February 2021, in the Southern District of New York and elsewhere, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

5.     It was a part and object of the conspiracy that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

**COUNT THREE**

(Conspiracy to Commit Money Laundering)

6.     From at least in or about June 2019 up to and including at least in or about February 2021, in the Southern District of New York and elsewhere, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).

7.     It was a part and an object of the conspiracy that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, cash and wire transactions, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds

3

of specified unlawful activity, to wit, wire fraud, knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

8.  It was further a part and an object of the conspiracy that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9.  I am a Special Agent with the IRS-CI and I have been personally involved in the investigation of this matter. I have worked on this investigation with Special Agents of Homeland Security Investigations and the United States Attorney's Office for the Southern District of New York. This affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, my review of bank records, my review of business incorporation records, my examination of physical evidence, and my examination of electronic communications recovered from a search of property belonging to two co-conspirators not named as defendants herein ("CC-1" and "CC-2"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein,

they are reported in substance and in part, except where otherwise indicated.

## The Boiler Room Scheme

10.  From my participation in this investigation, which includes my interviews with victims, my review of wire transfer and bank records, my review of electronic communications between co-conspirators, and my review of accounting records maintained by the co-conspirators, I know that since at least 2019, a group of conspirators operating in the United States and abroad, including in Thailand, have been engaged in a scheme to defraud victim investors by purporting to sell the victims securities and other investments, and to launder the proceeds of this fraud. This type of fraud is commonly referred to as a "boiler room." Victims of the boiler room believed they were making legitimate investments and were directed to make payments for these "investments" by international wire transfer into a series of bank accounts in New York. Victims did not receive anything in exchange for their payments, though in many instances, conspirators falsely represented that the value of a victim's initial "investment" had appreciated and induced the victim to make even larger payments to the conspirators under the guise of making additional investments.

11.  From reviewing bank records and records maintained by the State of New York, I know that the New York-based bank accounts that received funds from victims were held in the names of shell companies that lacked any legitimate business purpose. These shell companies, and their bank accounts, furthered the scheme in two ways. First, these accounts were used to receive fraud proceeds directly from victims. Second, the accounts were used to distribute fraud proceeds to conspirators in transactions designed to resemble legitimate business payments.

12.  From conversations with victims of the scheme and from reviewing records provided by victims, I have learned that the fraudulent scheme typically operated as follows:

   a.  The conspirators working for the boiler rooms (the "Boiler Room Conspirators") would contact victim investors by phone, email, or other means to offer victims investment opportunities. In some instances, victims had previously responded to online advertisements relating to investments, and in other instances, the Boiler Room Conspirators would cold-call victims. The Boiler Room Conspirators purported to represent a variety of investment firms. In most instances, the fraudulent investment firms used names that closely resembled the names of

5

legitimate, regulated investment firms. The Boiler Room Conspirators directed the victims to professional-appearing websites to further the impression that the conspirators were agents of legitimate investment firms.

      b. In their dealings with the Boiler Room Conspirators, victims were required to sign nondisclosure agreements. After a victim agreed to make an "investment" with a boiler room, the victim was directed to wire funds to an "escrow account" to complete the transaction. These escrow accounts were held in the United States in the names of four corporations ("Shell Companies-1, 2, 3, and 4" and collectively the "Shell Companies"), whose names suggested that the corporations were transfer agents[1] regulated by the U.S. Securities and Exchange Commission ("SEC").

      c. After making payments to these "escrow accounts," victims were provided documents that purported to show the change in beneficial ownership of securities. Victims were also able to access websites that purported to show their individual investment accounts. The Boiler Room Conspirators continued to contact victims to convince them to make additional investments. In almost every instance, if a victim became suspicious and requested a refund of their purchase or requested that the Boiler Room Conspirators sell the securities the victim purportedly owned, the Boiler Room Conspirators ceased contact with the victim, and the victim was unable to recover any losses.

<u>Overview of the Shell Companies</u>

    13. The Shell Companies that received the direct payments from victims held and used accounts with numerous banks that were opened under false pretenses. These accounts furthered the scheme in multiple ways. The first use of these accounts was to receive fraud proceeds from victims. In furtherance of this objective, the names of the Shell Companies, and the websites maintained to promote the Shell Companies, suggested the Shell Companies were transfer agents involved in securities transactions. The second use of the Shell Companies was to

---

[1] The term "transfer agent" refers to a company that keeps track of individuals and entities that own the stocks and bonds of a given company that has publicly traded securities. Among other things, transfer agents issue and cancel certificates to reflect changes in ownership, serve as the company's intermediary for payouts, exchanges, or mailings, and handle lost, destroyed or stolen certificates.

6

distribute the money received from victims to conspirators, including the Boiler Room Conspirators abroad. In furtherance of this objective, individuals opening accounts for the Shell Companies falsely described the Shell Companies' business activities to banks. In most instances, the person opening the account described the Shell Companies as involved with real estate transactions. Payments sent from the Shell Companies to the Boiler Room Conspirators were made by international wire transfer and almost uniformly were described as payments for "Consultancy Expenses."

### The Shell Companies Have No Legitimate Business

14. Based on a review of the websites for the Shell Companies, I know that on such websites the Shell Companies represented that they were transfer agents or were otherwise involved in investment management, and as such were registered with the SEC. For example:

   a. The website for Shell Company-1 described it as a "global leader in investment advisory and wealth management" that was founded in 2005 and had $2.4 billion in assets under management.

   b. The website for Shell Company-2 portrayed the company as a registered transfer agent.

   c. The website for Shell Company-3 described it as a transfer agent that provided escrow and shareholder accounting and transactional record keeping services.

15. Based on a review of publicly available records maintained by the SEC, I know that none of the Shell Companies were registered with the SEC.

16. Based on my review of records maintained by the New York State Department of State, I know that each of the Shell Companies is incorporated in New York and lists a residential address as its registered address. More specifically:

   a. Shell Company-1, lists a residential address in Glen Cove, NY ("Residence-1"). From reviewing bank records for Shell Company-1, I have learned that a particular individual ("CC-3") is the president of Shell Company-1.

   b. Shell Companies-2 and 3, were incorporated by a particular individual ("CC-4") at a residential address also in Glen Cove, NY ("Residence-2"). From reviewing bank records for

7

Shell Companies-2 and 3, I have learned that CC-4 is the president of Shell Companies-2 and 3.

      c.  Shell Company-4 lists a residential address in Glen Cove, NY. From reviewing bank statements for Shell Company-4's accounts, I know the corporation uses a different residential address in Glen Head, NY ("Residence-3") as its mailing address. From the same bank records, I know that a particular individual ("CC-5") is the president of Shell Company-4.

17.  In December 2020, agents conducted a search of Residence-1. During the search, agents learned that Residence-1 is the residence of CC-1 and CC-3.

18.  Vehicle registration records and cellphone subscriber data for CC-4 list Residence-2 as CC-4's home address.

19.  I know from reviewing bank and New York State Department of State records that CC-4 and an additional unnamed co-conspirator are officers in a different New York Corporation that received transfers of victim funds from the Shell Companies. From these same records, I know that the name of this corporate entity uses the address for Residence-3 in its official name.

20.  Based on my review of records maintained by the New York State Department of Labor for Shell Companies-1, 2, 3, and 4, I have learned that none of the Shell Companies have ever reported any wages paid.

<u>The Conspirators Make False Representations in Order to Open Shell Company Bank Accounts</u>

21.  Based on my review of account opening documents, and my review of reports of conversations with employees of the banks at which such accounts were opened, I know that CC-3, CC-4, and CC-5 (collectively, the "Shell Company Conspirators") opened numerous bank accounts in the names of the Shell Companies (the "Shell Company Accounts"). In doing so, the Shell Company Conspirators falsely represented the business activities of the Shell Companies. For example:

      a.  In the course of opening bank accounts for Shell Company-1 at four different banks ("Banks-1, 2, 3, and 4"), CC-3 represented that CC-3 was the owner and president of Shell Company-1. More specifically:

8

    i. Based on an interview of an employee at Bank-1, I know that in approximately September 2019, when opening an account for Shell Company-1 at Bank-1, CC-3 described Shell Company-1 as a real estate company whose business involved the purchase of overseas properties.

    ii. Based on an interview of an employee at Bank-2, I know that in approximately September 2020, CC-3, accompanied by CC-1, opened an account for Shell Company-1 at Bank-2. In the conversation with the Bank-2 employee, CC-3 and CC-1 represented that Shell Company-1 was a construction firm owned by CC-3 and managed by CC-1.

    iii. As described above, these representations were inconsistent with, among other things, representations made to victims and statements on Shell Company-1's website.

  b. CC-4 represented to multiple banks that CC-4 was the president of Shell Companies-2 and 3 and provided false information about those companies' business activities. For example, based on reports of an interview of an investigator at Bank-3, where CC-4 established an account for Shell Company-2, I know that CC-4 represented to Bank-3 that Shell Company-2 was a market research and real estate investment company. As described above, this is inconsistent with representations made to victims and statements on Shell Company-3's website.

  c. CC-5 represented to multiple banks that CC-5 was the president of Shell Company-4 and provided false information about that company's business activities. For example, based on my review of records from another bank ("Bank-5"), I know that when opening an account for Shell Company-4 at Bank-5, CC-5 represented that Shell Company-4 was a real estate property management company. As described above, this was inconsistent with representations made to victims about the nature of Shell Company-4's business activities.

Use of the Shell Company Accounts

22. Based on my review of bank records for the Shell Company Accounts, I know that such accounts were all funded in a similar manner:

  a. These accounts were funded almost exclusively by wire transfers from individuals located outside of the United States that were victims of the fraud. These wires ranged in value from less than $500 to nearly $400,000 in a single

transaction. Based on my review of reports of conversations with individuals who wired money to the Shell Company Accounts, and my review of written complaints from such individuals, I am aware that many, if not all, of these wires were intended to fund purported investments.

      b. Many of the wire transfers to the Shell Company Accounts have payment descriptions indicating an intended purchase of securities. For example, there are wires with the following notations: "Trade Payment NYSE," "Palantir IPO," and "Airbnb IPO." Also, in numerous instances, the payment description included a combination of the victim's initials or name and a series of numbers, or a string of numbers. Based on my review of wiring instructions and payment confirmations sent from the Boiler Room Conspirators to certain victims, I know that the Boiler Room Conspirators frequently gave the victims unique account numbers or transaction numbers to include in the payment details of the wire transfers the victims sent to the Shell Companies, which is consistent with the payment details I observed in the account records of the Shell Companies.

23. Based on my review of bank records for the Shell Company Accounts, I also know that each of the accounts operated in a similar manner to distribute the fraudulent proceeds from the accounts to conspirators in the United States and to the Boiler Room Conspirators abroad. For example:

      a. Based on my review of records for an account held in the name of Shell Company-1 at Bank-3, I know that between October 2019 and August 2020, the account received more than $700,000 in wire transfers from victims. Distributions of such funds, included the following:

          i. Distributions of these funds to United States-based conspirators included: (i) more than $22,000 in cash withdrawals; (ii) about $29,000 in check payments to CC-3; (iii) about $2,700 in check payments to CC-1; (iv) about $12,400 in check payments to accounts jointly controlled by CC-1, CC-4, and one other unnamed conspirator; (v) payment of personal expenses for CC-1 and CC-3; (vi) $4,000 in check payments to a different account held in the name of Shell Company-1; and (vii) about $148,000 in check payments to an account held in the name of Shell Company-2.

          ii. Distribution of these funds to Boiler Room Conspirators abroad included: (i) approximately $370,000 in international wire transfers to accounts based primarily in the Philippines and Thailand that were described as payments for

10

"Consultancy Expenses;" and (ii) an additional $45,000 wire transfer to an overseas entity with the same name as Shell Company-3 that was also one of the entities listed above that was paid for "Consultancy Expenses."

        iii.  In conducting the investigation, I have obtained and reviewed corporate records for Shell Company-1. In my review of these corporate records, I have seen no instances in which Shell Company-1 contracted with any individual or business entity for the provision of consultant services.

    b.  My review of records for an account held in the name of Shell Company-2 at Bank-3 shows a similar pattern of activity. This account received about $580,000 in victim payments with nearly all of it paid by two victims. The account also received about $95,000 from an account held by Shell Company-1 at Bank-1 and about $160,000 in ATM check deposits.

        i.  The distribution of funds from this account included: (i) approximately $36,000 in cash withdrawals; (ii) $21,500 in check payments to CC-4, the account owner; (iii) $5,000 in check payments to CC-1; (iv) $10,000 in check payments to accounts jointly controlled by CC-1, CC-4, and one other unnamed conspirator; and (v) 33 international wire transfers that totaled approximately $640,000 of which, 32 wire transfers were described as being for "Consultancy Expenses" and one was described as an "Invoice Payment."

        ii.  In conducting this investigation, I have obtained and reviewed corporate records for Shell Company-2. In my review of these corporate records, I have seen no instances in which Shell Company-2 contracted with any individual or business entity for the provision of consultant services or made a purchase for any goods or services from an overseas entity.

    c.  Based on my review of records for an account held in the name of Shell Company-3 at Bank-1, I know that in August and September 2020 the account received about $620,000 of victim funds. The account paid $9,000 via wire transfer to an overseas account associated with a known Boiler Room Conspirator. The account was shut down by Bank-1 before any additional distributions were made.

    d.  Based on my review of records for an account held in the name of Shell Company-4 at Bank-3, I know that it received more than $1,600,000 of victim funds and paid more than $1,100,000 for "Consultancy Expenses" across 63 transactions to

individuals and business entities located primarily in the Philippines and Thailand. An additional $7,000 of international wire transfers were described as payments for "Business Expenses" or as an "Invoice Payment."

24. From reviewing bank records for the Shell Companies, I have learned that in many instances, to complete a wire transfer between a foreign victim and a domestic shell company, a correspondent or intermediary bank was involved. In my training and experience, I know that correspondent and intermediary banks are used to facilitate international wire transfers between two banks that do not have a direct banking relationship. Based on these same bank records, I know that many of the wire transfers from victims to the Shell Companies were processed through correspondent and intermediary banks located in the Southern District of New York.

### ROBERT LENARD BOOTH's Participation in the Scheme

25. ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, is a United States citizen who was born in Jamaica. Around 2019, BOOTH changed his legal name from "Trevor Nicholas" to "Robert Lenard Booth." According to United States passport application records, in April 2017, BOOTH received a passport under the name "Trevor Nicholas." In August 2019, BOOTH received a new passport under the name "Robert Lenard Booth." The applications for both the 2017 and 2019 passports have photos that appear to be of the same person, and both applications list the same date of birth and last four digits of the applicant's social security number. The 2019 application lists "Nicholas, Trevor" as another name used by BOOTH.

26. As part of the investigation, I have interviewed CC-2,[2] who was involved in managing the Shell Company Accounts and maintained accounting records that tracked the flow of money from victims and its distribution back to the Boiler Room Conspirators, less a percentage maintained by CC-2 and others involved with operating the Shell Company Accounts. According to CC-2, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, was a Boiler Room Conspirator operating primarily from Panama and Thailand. BOOTH solicited fake investments from victims, directed the victims to pay into the Shell Company

---

[2] CC-2 has been arrested for wire fraud and money laundering offenses and is cooperating in the hopes of receiving leniency at sentencing. CC-2's information has proven reliable and has been corroborated by other evidence, including the bank records and accounting records described above.

12

Accounts, and then coordinated with CC-2 to have the victims' money sent from the Shell Company Accounts to him at bank accounts he controlled around the world. CC-2 knows BOOTH primarily as "Trevor," however, CC-2 paid "Trevor" his share of the fraud proceeds at accounts held in the names of "Trevor Nicholas" and "Robert Lenard Booth."

27.  Based on my review of bank records for the Shell Company Accounts, accounting records seized from CC-2, and my interviews with CC-2, I know that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, caused victims of the scheme to pay approximately $641,197 to the Shell Company Accounts.

   a.   In August 2019, a Shell Company Account held in the name of Shell Company-4 received payments from, among other victims, two victims that, as described below, had been induced to pay into the scheme by BOOTH. The first victim ("Victim-1") paid $11,980 and the second victim ("Victim-2") paid $35,962. Both payments were made by international wire transfer. These payments are identifiable in the account records for Shell Company-4.

   b.   Accounting records maintained by CC-2 confirm that Victims-1 and 2 were induced to pay into the Shell Company Accounts by BOOTH. On a page in CC-2's accounting records from July and August 2019, the words "TREVOR" and "Panama" appear at the top of the page. Next to that is the annotation "75 pts." Based on my interviews with CC-2 and my review of text messages sent between CC-1 and CC-2, who were partners in managing the Shell Company Accounts, I understand the above annotations to mean that "TREVOR" received back 75% of payments made by victims to the Shell Company Accounts. Further down the page, the payments of $11,980 and $35,962 to the Shell Company Account are recorded. Below the entry for the $11,980 payment there is an annotation "Mr. T $8,985" and next to that in large print, "Paid Out." Below the entry for $35,962 payment there is the annotation "Trevor→ $25,200 $27,000." Written across the entry in large letters is the word "Paid." Based on my interviews with CC-2, I know the references to "Mr. T" and "Trevor" are references to BOOTH.

   c.   Beyond the payments from Victims-1 and 2, the accounting records maintained by CC-2 reflect an additional 15 payments from victims of the scheme that were directed to pay to the Shell Company Accounts by "Trevor." These payments are identifiable in the accounting records because the names of the victims who made the payments (who are described in the records as "clients") appear next to the name "Trevor" in the entries

13

recording the payments. The records also list the amount paid by each victim, and these entries in the accounting records have been verified against the bank account records for the Shell Company Accounts. These 15 payments represented additional losses of approximately $593,255 to the victims. Include among these 15 payments from victims to "Trevor" are the following:

      i.    On or about February 12, 2020, a victim in Canada wired $12,000 to an account held by Shell Company-1. Account records from the Shell Company Accounts show this payment was processed through a correspondent bank account in New York, New York.

      ii.    On or about August 26, 2020, a victim in Canada wired $109,975 to an account held by Shell Company-2. Account records from the Shell Company Accounts show this payment was processed through a correspondent bank account in New York, New York.

      iii.    On or about September 10, 2020, a victim in Australia wired $12,000 to an account held by Shell Company-2. Account records from the Shell Company Accounts show this payment was processed through a correspondent bank account in New York, New York.

      iv.    On or about December 7, 2020, a victim in Canada wired $95,985 to an account held by Shell Company-4. Account records from the Shell Company Accounts show this payment was processed through a correspondent bank account in New York, New York.

      v.    On or about December 10, 2020, a victim in Canada wired $17,485 to an account held by Shell Company-4. Account records from the Shell Company Accounts show this payment was processed through a correspondent bank account in New York, New York.

    d.    The accounting records are explicit that "Trevor" is BOOTH. On one page where CC-2 recorded banking information for the Boiler Room Conspirators, there is an entry that reads in part "Robert Lenard Booth (AKA. TREVOR)."

    e.    Account records for the Shell Company Accounts provide additional confirmation that the payments described above were from victims of the boiler room scheme and that the victims believed they were purchasing securities or otherwise investing with BOOTH. For example, the wire notes for Victim-2's payment from August 2019, described above, read "[Victim-2's

last name] PURCHASE SHARES." The wire notes for another victim's payment, from January 2020, read "[Victim last name] purchasing securities." Other wire notes had combinations of a victim's name and numbers that are consistent with the practice of assigning fake account numbers to victims to further the perception that victims are making payments into legitimate investment accounts.

28. According to bank records from the Shell Company Accounts, between August 2019 and November 2020, ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, received approximately $445,461 that had been stolen from victims of the scheme. This money was paid from the Shell Company Accounts to accounts BOOTH controlled or had access to in Panama and Thailand.

    a. Account records show that in August 2019, an account held in the name of Shell Company-4 made three wire transfers to an account at a bank in Panama held in the name of "Trevor Nicholas" (the "Nicholas Account"). The payments to the Nicholas Account were made in three wire transfers in the amounts of $8,985; $25,180; and $1,800. The payment descriptions for each wire transfer described the payments as for "Consultancy Expenses." The amount sent to the Nicholas Account in August 2019--$35,965--was equal to 75% of the combined amount that Victims-1 and 2 paid into the Shell Company Accounts in the same month. The payments are consistent with the accounting records, referenced in Paragraph 27.b above, which state "Trevor," "Panama," and "75 pts" at the top of the page.

    b. Account records further show that between November 2019 and November 2020, accounts held in the names of Shell Companies-1, 2, 3, and 4 sent 11 wires, totaling approximately $265,416, to an account at a bank in Thailand held in the name of "Robert Lenard Booth" (the "Booth Account"). The payment descriptions for each wire transfer described the payments as for "Consultancy Expenses."

    c. BOOTH received one additional payment in November 2019 that was paid to an account in Thailand other than the Booth Account. CC-2's accounting records indicate that around November 5, 2019, $46,500 was "sen[t] out" to BOOTH. This payment was for BOOTH's 75% share of a $62,000 victim payment and is identifiable as money owed to "Trevor" in the accounting records seized from CC-2. Account records from a Shell Company-1 Account show this payment was made on or about November 7, 2019 and was paid to an account in Thailand commonly used by other co-conspirators in the scheme.

29. Based on my review of electronic communications seized from cell phones belonging to CC-2, I know that ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, was in regular contact with CC-2 regarding the scheme, the money BOOTH was directing victims to pay to the Shell Company Accounts, and the money that BOOTH was owed from these victims' payments. Based on an interview with CC-2, I know that BOOTH was saved as a contact on CC-2's phones under the name "MR. T Trevor Panama" and that BOOTH regularly communicated with CC-2 using encrypted messaging applications to send and receive voice and text messages. Sample communications between BOOTH and CC-2 by encrypted messaging application include the following:

a. Around July 21, 2020, CC-2 sent BOOTH a message asking if a victim's payment for $110,000 was coming soon and if he should "scratch out or keep in book." BOOTH responded in a text message stating "Keep in book, on this Wed." CC-2 responded on July 25, 2020, telling BOOTH to have the victim pay to an account held by Shell Company-1. On August 6, 2021, CC-2 sent BOOTH a text message stating, "Do Not sent to [Shell Company-1] as we are doing our Quarterly Corporate Taxes.. Here is a Fresh Account to Use:" CC-2 then provided account details for an account held by Shell Company-2. Account records confirm this victim sent the Shell Company-2 account $109,975 on or about August 26, 2020, and CC-2's accounting records confirm this payment was from one of "Trevor's" victims.

b. Around September 16, 2020 BOOTH sent CC-2 a recorded voice message regarding money that BOOTH believed he was owed and which he had not yet received to his account in Thailand. In part, BOOTH said: "Nothing came in from [Shell Company-3], nothing came into [the bank in Thailand that maintained the Booth Account], I already check . . . The money was not sent and you need to understand that . . . straighten out with your people in New York . . . you're holding me up . . . I have other deals going in and I need to have everything solidified before we can move forward . . . Business is business, do your job, that's what you get paid for." Based on my interviews with CC-2 and my involvement in the investigation, I know that any money BOOTH was owed by CC-2 was BOOTH's share of money sent from victims to the Shell Company Accounts.

c. Around October 2, 2020, BOOTH sent CC-2 a recorded voice message stating in part: "This is T . . . I just want to ask you a question because I have a guy in Canada for $62,000 and I like to know if I can pull the trigger on it." Based on my interviews with CC-2 and my involvement in this

16

investigation, I know that "a guy in Canada for $62,000" is a reference to a victim willing to send $62,000.

      d. Around October 21, 2020, BOOTH sent CC-2 a recorded voice message asking about money owed to BOOTH, stating in part: "Can you send me my money today, send us our money today, today I want a confirmation, $97,580 . . . Send me a confirmation today please so we can move on."

      e. Around October 29, 2020, BOOTH sent CC-2 a recorded voice message in which he asked "Is [a specific bank] still in the works because I have a guy going down for $160,000?" CC-2 responded with a recorded voice message stating, "No, I said [the specific bank] is not still in play . . . [Shell Company-4], [Shell Company-4], [Shell Company-4], you got that information alright. I forwarded it over." Based on my interviews with CC-2 and my involvement in this investigation, I know that "a guy going down for $160,000" is a reference to a victim who is willing to pay $160,000.

      WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of ROBERT LENARD BOOTH, a/k/a "Trevor Nicholas," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

                               s/ Benedict Castro by KNF,USMJ
                               Special Agent Benedict Castro
                               Internal Revenue Service-
                               Criminal Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1,

this  26  day of August, 2021,

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK