UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
  UNITED STATES OF AMERICA     │
│                              │
│     -v-                      │      21-cr-652 (JSR)
│                              │
│  ROBERT LENARD BOOTH,        │      MEMORANDUM ORDER
│                              │
│           Defendant.         │
└─────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.:

Defendant Robert Lenard Booth made several pre-trial motions in this case, and the Court ruled on these from the bench following argument on January 10, 2022. See Minute Entry 1/10/2022.[1] Specifically, the Court granted Booth's motion to suppress certain statements made during an interview at J.F.K. International Airport in violation of his Fifth Amendment right to counsel and his motion for a bill of particulars. The Court denied Booth's motion to dismiss the indictment (or, in the alternative, Count III) for lack of venue, his motion to dismiss Count III for failure to allege an independent transaction to support a money laundering conspiracy charge, his motion to suppress the manual search of his cellphone at J.F.K. Airport, and his motion to suppress statements made during his interview at J.F.K. Airport before his unambiguous request for counsel.

At the January 10, 2022 hearing, the parties were also given leave to file supplemental briefing on two issues related to Booth's

---

[1] The Court addressed Booth's additional requests concerning discovery and pre-trial disclosure issues during a prior conference. See Minute Entry dated 12/10/2022.

motion to suppress his statements at J.F.K. The Court, having now had the benefit of the parties' supplemental papers, issues this order elaborating the reasons for its aforementioned rulings as well as addressing the issues to which the supplemental briefing relates. The Court assumes the parties' familiarity with the facts of this case.

I.  **Motion to Dismiss**

A. **Multiplicity**

Booth moves for dismissal of Count III, which charges him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Booth argues that there is improper multiplicity, because Count III of the Indictment purportedly relies on the same financial transactions as Count I, which charges Booth with conspiracy to commit securities fraud. The Government responds that this motion misreads both the case law on multiplicity and the charging documents. The Court agrees with the Government and denies this motion.

An indictment is multiplicitous in contravention of the Double Jeopardy Clause when a single offense is alleged in more than one count. United States v. Israelski, 597 F.2d 22, 24 (2d Cir.1979).[2] Courts analyze multiplicity using a three-step inquiry to determine whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions. See United States v. Nakashian, 820 F.2d 549, 551 (2d Cir. 1987). First, "[i]f the offenses

---

[2] Unless indicated otherwise, all internal quotation marks, omissions, emphases, alterations, and citations are omitted from all sources cited herein.

charged are set forth in different statutes or in distinct sections
of a statute, and each section unambiguously authorizes punishment for
a violation of its terms, it is ordinarily to be inferred that Congress
intended to authorize punishment under each provision." Id. Second,
the Court must analyze the two offenses' elements using the Blockburger
test to determine if they "are sufficiently distinguishable from one
another that the inference that Congress intended to authorize multiple
punishments is a reasonable one." Id. (citing Blockburger v. United
States, 284 U.S. 299 (1932)). Third, if the offenses are distinct
under a Blockburger analysis, the Court may still look to any
legislative history evidence that reveals a contrary legislative
intent. Id.

The indictment filed against Booth easily passes the three-part
test set forth in Nakashian. First, the charges of conspiracy to commit
securities fraud (18 U.S.C. § 371) and conspiracy to commit money
laundering (18 U.S.C. § 1956(h)) rely on different statutes. By
contrast, in United States v. Holmes, the only case upon which Booth
relies, the defendant was convicted of both money laundering and
structuring transactions under disjunctive provisions of the same
statute, so the Second Circuit held that "[h]aving knowledge of two
improper purposes rather than one does not multiply the offense of a
single financial transaction into two offenses." 44 F.3d 1150, 1155
(2d Cir. 1995). By contrast, the Supreme Court and the Second Circuit
have repeatedly declined to dismiss indictments for multiplicity where
multiple, factually related conspiracies are charged under different

statutes. See, e.g., Albernaz v. United States, 450 U.S. 333, 335-336 (1981); Nakashian, 820 F.2d at 552-553; United States v. Thomas, 757 F.2d 1359, 1369-1371 (2d Cir. 1985).

Second, the Indictment passes the Blockburger test, because "each provision requires proof of a fact which the other does not." 284 U.S. at 304. Conspiracy to commit securities fraud requires proof of an agreement to commit securities fraud, whereas conspiracy to commit money laundering requires proof of an agreement to commit money laundering. See Opp. 7 n. 6 (listing elements). This supports the inference that Congress intended separate punishment for conspiracies to commit securities fraud and to launder proceeds from securities fraud.

Finally, as to the third part of the test, the defense offers no countervailing legislative history. The Court therefore concludes that the indictment is not multiplicitous, even if both charges supposedly relate to the same financial transactions.

But even that suggestion is erroneous, because, as the Government explains, the Complaint, which sets forth some of the particulars on which these counts of the Indictment are based, clearly shows that the counts are based on distinct transactions: wire transfers from victims through New York correspondent banks to shell companies, in furtherance of the securities fraud conspiracy, see, e.g., Compl. ¶ 27(c)(i)-(v), and international, dollar-denominated wires from those shell company accounts to conceal money-laundering distributions of fraudulent proceeds to Booth and his coconspirators, see, e.g., Compl. ¶ 28. See

Opp. 4-5 n. 3. The Complaint describes, for example, how wire transfers distributing proceeds internationally were labeled as for "Consultancy Expenses," reflecting an intent to conceal the illicit source of these proceeds of unlawful activity. Cf. ECF 25 ("Reply") at 3. As this illustrates, the money laundering transactions are not part of the predicate securities fraud conspiracy. This provides an independent basis to conclude that the indictment is not multiplicitous.

The motion to dismiss on grounds of multiplicity must therefore be denied. The Court, however, grants Booth's alternative request for a "bill of particulars to name the date, time and locations of such financial transactions that are separate from those alleged to be securities fraud." Mot. 3-4. While the Government previously opposed this request on procedural grounds,[3] counsel for the Government consented during oral argument to providing the bill of particulars Booth requests. See Transcript, 1/10/2022.

**B. Venue**

Booth contends that venue in this district is improper for the money laundering conspiracy count and asks the Court to dismiss the indictment or, in the alternative, to dismiss Count III, for improper venue. But Booth's argument contradicts the plain text of the money

---

[3] The Government opposed Booth's request for a bill of particulars on the procedural ground that defense counsel had failed to meet and confer on this request and did not file the affidavit required by Local Criminal Rule 16.1. Nonetheless, the Court held a colloquy on this issue between counsel, which it deems a sufficient substitute.

laundering statute and the interpretive case law. The Court accordingly
denies this prong of Booth's motion.

The money laundering statute includes the following venue provision:

**18 U.S.C. § 1956(i) Venue.—**
    (1) Except as provided in paragraph (2), a prosecution for an
        offense under this section or section 1957 may be brought
        in—

        (A) any district in which the financial or monetary
            transaction is conducted; or

        (B) any district where a prosecution for the underlying
            specified unlawful activity could be brought, if the
            defendant participated in the transfer of the proceeds
            of the specified unlawful activity from that district
            to the district where the financial or monetary
            transaction is conducted.

    (2) A prosecution for an attempt or conspiracy offense under
        this section or section 1957 may be brought in the district
        where venue would lie for the completed offense under
        paragraph (1), or in any other district where an act in
        furtherance of the attempt or conspiracy took place.

    (3) For purposes of this section, a transfer of funds from 1
        place to another, by wire or any other means, shall
        constitute a single, continuing transaction. Any person who
        conducts (as that term is defined in subsection (c)(2)) any
        portion of the transaction may be charged in any district
        in which the transaction takes place.

Under this provision, venue lies for money laundering conspiracy where
the defendant participated in the underlying unlawful activity from
which the laundered funds were derived, as long as the defendant
allegedly played a role in transferring the funds from that district.
For a conspiracy charge, venue lies where the planned unlawful activity
would be accomplished or where any overt act in furtherance of the

conspiracy was committed. See Whitfield v. United States, 543 U.S. 209, 218 (2005).

The charging documents in this case provide two bases for venue in the Southern District of New York. First, in the Complaint, Booth is alleged to have both participated in the underlying unlawful activities (securities fraud conspiracy and wire fraud conspiracy) and to have caused the alleged investor victims' funds to be transferred to shell company accounts through New York, N.Y. See ECF 1 ("Compl.") ¶ 27. Then, the Indictment alleges that overt acts in furtherance of the securities fraud conspiracy were taken in the Southern District of New York. See ECF 12 ("Ind.") ¶ 3. Since "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed," Whitfield, 543 U.S. at 218, these allegations establish that venue for the underlying unlawful activity lies in this District. Therefore, venue to prosecute a conspiracy to launder the proceeds of that securities fraud conspiracy also lies in this District. See 18 U.S.C. § 1956(i)(1)(B).

Second, Booth allegedly participated in a conspiracy to launder the proceeds of those fraudulent schemes by causing funds to be transferred through wire transfers designed to conceal the source of the funds to accounts controlled by himself and his coconspirators. The Indictment alleges these transactions occurred in this District and elsewhere. See Ind. ¶ 6. This allegation is based, at least in part, on correspondent banking transactions for international wire transfers. The allegation that transactions in furtherance of the

money laundering conspiracy took place in New York also establishes venue. See 18 U.S.C. § 1956(i)(1)(A). See U.S. v. Cabrales, 524 U.S. 1, 7 (U.S. 1998) (Conspiracy is a "continuing offense" that "may be 'prosecuted in any district in which the offense was begun, continued, or completed.'" (quoting 18 U.S.C. § 3237(a))).

Accordingly, venue for the money laundering conspiracy is proper, and this prong of the motion is denied.

II.  **Motion to Suppress**

A. **Statements During J.F.K. Airport Interrogation**

a. Facts

Booth was detained at the customs checkpoint at J.F.K. Airport after arriving on a flight from Thailand via Dubai.  He was taken to a private room for a "secondary screening interview" by two armed federal agents, one from Immigration and Customs Enforcement and another from IRS-Criminal Investigation ("IRS-CI"). The IRS-CI agent had a warrant for Booth's arrest, and Booth was in fact arrested at the conclusion of the first phase of his interrogation.

For the purpose of this motion, the interrogation should be considered in three parts.

First, at the outset, the ICE agent questioned Booth in what the Government calls a "border screening interview" that lasted about 10 minutes. See ECF 32-1 ("Tr.") 6:16 ("You were selected for secondary inspection, so anybody who's entering or exiting the United States is subject to a border inspection."). Booth was not read a Miranda warning. The questioning during this phase concerned Booth's flight

itinerary, his travel to and from Thailand, his permanent residence, how long he intended to remain in the United States, whether he had a return ticket to Thailand booked, whether he conducted business in the United States, his former occupation (Booth said he was retired), whether he owned or operated any foreign or domestic companies, and whether he had any income other than his pension. See Opp. 19 n. 9.

Then, second, the agents disclosed the arrest warrant. Tr. 12:15. The federal agents read Booth a Miranda warning and presented him with a written waiver form. Tr. 13:16. Booth declined to sign the waiver form but stated that he understood it. Tr. 15:22. The IRS-CI agent joined the questioning. Tr. 16:13. Booth then proceeded to answer the agents' questions about banking records they showed him.

Third, several minutes into the post-arrest questioning and after he asked the agents if answering questions about particular money transfers would "incriminate" him, Tr. 22:4, Booth stated: "I need to talk to a lawyer and explain it to them, let them explain it to you." Tr. 22:23. The questioning then continued for an additional 32 transcript pages, during which time Booth expressed a desire to speak with an attorney eight more times. See Reply 6 (collecting instances).

>b. Phase I: Border Inspection

The issue with respect to the first, border inspection phase of the interrogation is whether Booth was "in custody" at that time. If he was, then the agent's decision not to give a Miranda warning would require suppression of Booth's statements during this phase.

The Second Circuit addressed has addressed the question of whether secondary screening interviews during immigration processing at an airport amount to a custodial interview, and it has rejected the proposition that "a general exception to Miranda for border questioning exists". See U.S. v. FNU LNU, 653 F.3d 144, 146 (2d Cir. 2011). Nevertheless, FNU LNU affirmed the denial of a suppression motion concerning statements made during a secondary border screening at JFK Airport, by applying the full objective custody analysis developed under the Miranda line of cases to determine whether "a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest. Id. at 153. The Second Circuit determined that the FNU LNU interrogation was not custodial based on the totality of the circumstances, concluding that a reasonable person would consider the circumstances of that interrogation "par for the course of entering the country from abroad. Id. at 154-155.

Like the defendant in FNU LNU, Booth was subject to interrogation by armed guards (who never drew their weapons) in a closed room and out of public view, but he was never subject to physical restraints. Id. at 154. Furthermore, his border inspection questioning only lasted about 10 minutes, far less than the 90 minutes of questioning that occurred in FNU LNU. This all weighs in favor of finding that the questioning was not custodial.

The only factors that distinguish FNU LNU and weigh in favor of finding the interview to have been custodial is the scope of

questioning, an issue that the Second Circuit has described as "crucial[]" to the analysis. Id. at 155. The questioning in Booth's case swept somewhat more broadly than those topics "a reasonable person would recognize ... as relevant to [his] admissibility to the United States," id., such as where he worked before his retirement, details about his income streams, and whether he controlled any domestic or foreign companies. These questions were also clearly motivated by the pending criminal investigation, not immigration concerns. But the Supreme Court has clearly held that the questioning officer's subjective motives are not relevant to determining whether an interrogation was custodial. See, e.g., Stansbury v. California, 511 U.S. 318, 323-326. Morever, the Government contends that these questions were sufficiently related to the routine immigration questions regarding occupation and admissibility of a person's effects. See ECF 30. The Court ultimately agrees with the Government that the scope of the questioning was not unreasonable for a secondary screening interview.

Accordingly, the Court determines that the secondary screening portion of Booth's interrogation was not custodial, so the agents need not have read Booth a Miranda warning. This aspect of Booth's motion to suppress is therefore denied.

c. Phase II: Post-Arrest

The initial phase of the post-arrest interrogation occurred after a Miranda warning was given and the defendant manifested verbal agreement that he understood the rights presented in the waiver form.

The defense argues that there is some ambiguity about Booth's understanding because the agent at one point posed a compound question. See ECF 28 at 2. But the Court has no doubt from other parts of the conversation, see, e.g., Tr. 15:19-22, that Booth understood his Miranda rights after they were read aloud and then presented to him on paper, and that Booth understood the consequences of continuing to speak. See United States v. Plugh, 648 F.3d 118, 127-128 (2d Cir. 2011) (waiver must be "knowing" and "voluntary"); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (analyzing waiver of Miranda rights in consideration of "the totality of the circumstances"). While Booth did not sign the waiver form, a waiver need not be confirmed in writing, and he further manifested his oral waiver by continuing to talk to the agents. See Plugh, 648 F.3d at 125-126. Nor did he invoke his Fifth Amendment rights at that time, since he did not firmly request an attorney or a suspension of the questioning.

Accordingly, the Court holds that Booth waived his Miranda rights at the outset of his post-arrest interrogation and voluntarily spoke to the agents knowing the implications of that waiver. These statements will therefore not be suppressed.

d. Phase III: Post-Invocation

The third phase of the interrogation begins on page 22 of the transcript, when, in response to questions about his banking practices and after repeatedly asking whether answering would "incriminate" him, Booth states "I need to talk to a lawyer and explain it them, let them explain it to you." Tr. 22:4, 22:23-24. Booth thereby "unambiguously

12

request[ed] counsel" in a manner that any "reasonable police officer
in the circumstances [sh]ould understand ... to be a request for an
attorney." Davis v. United States, 512 U.S. 452, 459 (1994). At that
point, the agents should have followed their constitutional duty and
"immediately cease[d] questioning him until an attorney [wa]s present"
rather than plowing ahead. Id. at 462.

Apparently recognizing that its agents violated Booth's Fifth
Amendment rights, the Government represents that it will not offer in
its case in chief any statement after Booth's unambiguous request for
a lawyer. See ECF 23 ("Opp.") at 30-31. Consequently, the Government
argues that the motion to suppress these statements is moot. Id.

The Government nonetheless reserves the right to make use of
these statements on cross-examination if Booth testifies at trial in
a manner inconsistent with these statements. While, if the Court were
writing on an open slate, it would find that is improper for statements
obtained in flagrant violation of the Defendant's Miranda rights to
be used at trial for any purpose, the Supreme Court and the Second
Circuit had held otherwise. See, e.g., Oregon v. Hass, 420 U.S. 714,
722 (1975); United States v. Kaba, 999 F.2d 47, 50 (2d Cir. 1993)
(holding that statements obtained in violation of the right to counsel
were admissible for impeachment unless they were involuntary).
Accordingly, the Court agrees that this prong of the suppression motion
is moot, because the Government will not seek to introduce these
statements for any other purpose than cross-examination.

In sum, the Court denies Booth's motion to suppress his statements made at J.F.K. Airport, with a denial on the merits as to the interrogation's first two phases and, upon reconsideration, a denial for mootness as to the final phase.

B. **Manual Search of Booth's Cell Phone**

After Booth was taken aside at the immigration checkpoint, the agents confiscated Booth's cellphone, which was ultimately seized pursuant to his arrest. Booth contends that while he was being interrogated, the agents manually searched through his phone without his consent. The interview transcript suggests the same, see, e.g., Tr. 52:5, and the Government does not dispute the fact of a search, though the extent of the search has not been established.[4] The Government obtained a warrant to search the phone five days after Booth's arrest. Opp. 28. The Government further represents that the "affidavit submitted in support of the warrant incorporates the allegations made in the Complaint that was issued prior to the border search and relies on the probable cause that existed prior to Booth's arrest." Id.[5] Nor did the agents at the airport appear to use any of the information gleaned from their search of the phone in obtaining any of the statements that are admissible at trial.

---

[4] Booth contended an evidentiary hearing was necessary to determine the scope of the search. But since the scope of the manual search is, on the facts presented here, irrelevant, there is no need for an evidentiary hearing.

[5] Booth does not challenge that probable cause adequately supported the warrant.

Booth moves to suppress information gleaned from the agents' manual search at J.F.K. Airport. The Government opposes and asks the Court to hold that the Government has blanket authority to search cellphones carried by people crossing the border, a rule that the Second Circuit has never adopted. See Opp. 27. The Court declines to adopt so broad a rule, believing that, as in the case of phones seized pursuant to a lawful arrest, "the answer to the question of what police must do before searching a cell phone seized" from U.S. citizens crossing the border "is ... simple--get a warrant." Riley v. California, 573 U.S. 373, 403 (2014).

Nonetheless, the Court denies the motion to suppress, because it is clear that the Government would have inevitably discovered the same information when it searched the phone a few days later pursuant to a duly obtained warrant. See United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006) (permitting admission of evidence under the inevitable discovery doctrine where the "Court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor").

III. **Conclusion**

For the reasons set forth above, Booth's pre-trial motions are denied, except for that portion of his motion requesting a limited-scope bill of particulars, which the Government shall provide promptly.

SO ORDERED.

New York, NY
February 1, 2022

JED S. RAKOFF, U.S.D.J.