**Aaron M. Rubin, Esq.**
99 Wall Street Suite 1130
New York, New York 10005
212-725-4600
arubin@amresquire.com

August 4, 2022

*By ECF*
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

        Re:  United States v. Robert Lenard Booth, 21 Cr. 652 (JSR)

Dear Judge Rakoff,

        I write on behalf of Robert Lenard Booth with respect to his sentencing scheduled for August 11 at 4 p.m.

### I.    *Objections to PSR*

        On June 21, 2022, a draft Presentence Investigation Report ("PSR") was issued. On July 5, we sent a letter to Probation Officer Robert Flemen containing our objections to certain aspects of the PSR, including its calculation of the sentencing guidelines. On July 19, P.O. Flemen issued a revised and final PSR, which removed some allegations in response to our objections, (see PSR Addendum, at pages 18-24), but also continued to assert certain aspects to which we here maintain our previous objections, as set forth below, (including our differing view on the PSR's calculation of the applicable sentencing guidelines, which we address separately in Section II).

        **PSR Paragraph 17**. Our objection is that there is inadequate evidence to show that Jerome Austin, Jay Garnock, Antonella Chiaramonte and Alyssa D'Urso were engaged in an investment fraud scheme that included Mr. Booth. Jay Garnock, Antonella Chiaramonte and Alyssa D'Urso have pled not guilty and denied their allegations, and none of them were referenced by any evidence at Mr. Booth's trial. Additionally, Jerome Austin was indicted for, and pled guilty to, lying about his role, and, we submit, Mr. Booth's role, in an investment fraud scheme, and we believe that his statements to the Government in proffer sessions show that he was involved in another separate fraud distinguished from the one at hand. The Government declined to call Austin as a witness at trial, and any allegations of his involvement in a scheme with Mr. Booth are based solely on his own self-serving statements which have already been shown to be not credible, we submit.

        **PSR Paragraph 19**. We submit that there was inadequate evidence to show that Mr. Booth worked "to call investors." None of the four investors presented at trial testified that Mr. Booth called or spoke with them, and Mr. Chiofalo specifically testified that Mr. Booth's voice was not the voice that he spoke with to cause him to invest money, (when Mr. Booth's

voice was played for him in a recording by the Government in a meeting before the trial, he denied it was Booth). There is inadequate evidence to show that Mr. Booth "took elaborate steps" including stealing the names of investment firms, creating websites and emails and fake brokerages, or making calls appearing to be from New York. The evidence at trial was instead that Mr. Booth attempted to collect money for debts owed to an individual in Thailand. Such money was received from Daniel Wellcome's Companies, although money from Irvine Management was not proven to be illicit money, and neither was money from GCE Holdings & Transfer Company, LLC, which should not be included.

**PSR Paragraph 20**. We submit that there was insufficient evidence of Austin's involvement with the scheme with Mr. Booth. As we noted above, we object to the Government's reliance on Jerome Austin's self-serving statements, which we submit are not credible. Further, an objection is made to the generalized reference to "victims," because we submit there was only evidence relating to four victims who testified: Christopher Chiofalo, Gregory Smith, Franco Cesta and Paul Boulanger.

**PSR Paragraph 24**. We submit that the amount of $1.5 million overstates the loss, because it is based on money paid from 18 individuals to five companies, one of which is GCE holdings, for which there is inadequate evidence to establish that it was either part of the scheme or operated by Daniel Wellcome. The loss amount should instead be based on the payments that were made to the "Wellcome Companies" (ATC Holdings, BA Management, Irvine Management and DT Holdings), and only by the four individuals who testified at the trial (Christopher Chiofalo, Gregory Smith, Franco Cesta and Paul Boulanger). There is inadequate evidence to establish the nature of any payments made by individuals other than the four who testified at the trial, regarding the reason, purpose and circumstances of their payments, and whether they received anything of value in return. Therefore, to calculate the loss amount, we make reference to page 5 of Government Exhibit 1901, attached hereto as Exhibit A, which is a "detailed version" of the payments made. (Rauseo 626-630) As per page 5 of Government Exhibit 1901, there is 1 payment made by Gregory Smith for $85,000 to ATC Holdings, 2 payments made by Paul Boulanger for $34,870 to DT Holdings, a total of 4 payments by Franco Cesta (1 for $95,985 to DT holdings, 2 payments for $107,816.75 to ATC holdings, 1 payment for $109,975 to BA Management), and 5 payments made by Christopher Chiofalo for a total of $68,388.52 to DT Holdings. We submit that these are the only payments on which a loss amount should be based, for a total of $502,035.27. An additional payment by Cesta for $77,975, should not be included, because it was made to GCE Holdings, which was a company for which there is inadequate evidence of its association with Daniel Wellcome or the scheme. Additionally, the amount received by the accounts in Mr. Booth's name, should not be "approximately $780,000," as stated in the PSR. As Government Exhibit 1901, page 5, shows, a total of $189,693 was received by the accounts under Mr. Booth's name in Panama and Thailand, from the Wellcome Companies, relating to only the four victims who appeared at the trial. This excludes any moneys that were received from GCE Holdings, which was not sufficiently established to be part of the scheme, and excluding moneys received from Irvine Management, because the source of the money from Irvine Management was not adequately established to be illicit or part of the scheme. (Rauseo 630)

**PSR Paragraph 25**. The original draft of the PSR for this paragraph alleged that "ROBERT BOOTH orchestrated and oversaw the entire scheme." Among other objections to the contents of this paragraph, we objected to this characterization of his role as the orchestrator of the entire scheme. Following our objections, the final PSR omitted this language, presumably in response to our objections, (although the PSR states that "no changes have been made to the presentence report as a result of this objection.") This revision is highly significant because, contrary to the Government's assertions, we have submitted that Mr. Booth was not the orchestrator or "mastermind" of the scheme, and was not proven to be so. (Yet, the PSR at ¶ 41 still assesses Mr. Booth a 3-point enhancement under the guidelines because he allegedly "orchestrated and oversaw the entire scheme.") Our remaining objections to this paragraph continue to stand. We submit that there was inadequate evidence to show that Mr. Booth was the "leader of his boiler room and has several subordinate callers." The only associated person that was testified to was "J or Jen or Jay" at trial, and Wellcome did not have sufficient personal knowledge to establish whether she was a subordinate or supervisor herself. The Government claimed in its opening that the testimony of Jerome Austin would provide the basis of evidence to show Mr. Booth's supervisory role as a "mastermind," but Austin was indicted and pled guilty to false statements to the Government and therefore was not called as a witness.

**PSR Paragraph 26**. An objection is made to the inclusion of this entire paragraph. The Government's decision not to call Jerome Austin as a witness, and his conduct in lying to the Government leading up to, and during the trial, should preclude the inclusion of evidence related to any of his statements as not credible.

**PSR Paragraph 32**. The amount of $1.5 million is overstated, and we repeat our basis for this objection as set forth in our objections to PSR Paragraph 24, above.

## II.  *Offense Level Computation and Sentencing Guidelines*

Mr. Booth was convicted of three counts: conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering. The PSR calculated a total offense level of 36 points (PSR ¶ 40), a criminal history category of I (PSR ¶ 49), and an imprisonment range of 188 months to 235 months (PSR ¶ 73). For the following reasons, we submit that a more appropriate view of the guidelines should assess Mr. Booth a total offense level of 25 points with an imprisonment range of 57 months to 71 months. Additionally, as we address in Section III, we nevertheless believe that a sentence below the guideline range is justified as a sufficient and not greater than necessary punishment under the circumstances.

The following is our calculation of the appropriate guideline calculation in this case:

### Count One:

*Base offense level for Count One.* The base offense level for Count One should be 6, under §2B1.1(a)(2), because the offense of conspiracy to commit securities fraud carries a maximum sentence of five years' imprisonment. (See 18 U.S.C. § 371)

*Loss amount for Count One*. In the section regarding loss amount, the PSR overstates the loss amount under §2B1.1(b)(1)(I) as between $1,500,000 and $3,500,000. The loss amount should instead be no more than between $250,000 and 550,000 pursuant to §2B1.1(b)(1)(G). Our basis for this loss amount is set forth above in the section discussing our objection to PSR Paragraph 24. Therefore, 12 levels are added (not 16, as stated in the PSR).

*There should be no enhancement for schemes resulting in substantial financial hardship for five or more victims*. The PSR assesses a 4-point enhancement under § 2B1.1(b)(2)(B). However, there is insufficient evidence to assign this enhancement, as the testimony by the four victims at trial (Christopher Chiofalo, Gregory Smith, Franco Cesta and Paul Boulanger) did not establish their financial hardship, and in any event, the evidence did not establish that five or more victims were facing hardship, (because only four testified). There should be no levels added here.

*Resulting offense level*. After assessing an enhancement of 2 levels for a scheme committed outside the United States, (as applied by the PSR under §2B1.1(b)(19)(B)), the resulting offense level for Count One is therefore 6 + 12 + 2 = 20.

**Count Two**:

*Resulting offense level*. Our calculations, and our objections to the PSR calculations, with respect to Count Two are identical to those stated for Count One above, however, because wire fraud has a statutory maximum term of imprisonment of 20 years or more, a base offense level of 7 is applied, as the PSR states under §2B1.1(a)(1), rather than the 6 points applicable to the securities fraud charge under Count One. The resulting offense level is therefore 21.

**Count Three**:

*Base offense level for Count Three*. Pursuant to § 2S1.1(a)(1), the base offense level is the total offense level from the underlying offense, which is 21 (see above, Count Two), not 29 as stated in the PSR.

*Defendant was not a manager or supervisor*. We submit that the PSR unjustifiably assesses a 3-point enhancement for Mr. Booth's role in the offense, stating that he "orchestrated and oversaw the entire scheme," a claim that the PSR had originally asserted in its draft report but omitted from its final version under Paragraph 25. As we also addressed in our objections to PSR Paragraph 25, above, there was insufficient evidence that Mr. Booth was the orchestrator or mastermind (especially because the Government conceded in its opening statement that Jerome Austin would be the central witness to such a claim but Austin was never called to testify, nor was he a credible witness).

*Total offense level*. In light of the 2-point enhancement correctly assessed by the PSR in Paragraph 38, and the 2-point enhancement assessed by the PSR in Paragraph 39, the total offense level should therefore be 21 + 2 + 2 = 25, (not 36 as stated in the PSR ¶ 46).

With a Criminal History Category of I, we submit the imprisonment range under the guidelines is 57-71 months.

### III.     Additional Considerations Under 18 U.S.C. § 3553(A)

Although we calculated a range under the sentencing guidelines according to a loss amount to $502,035.27, the bank accounts in the name of Mr. Booth did not receive the entirety of these funds. According to page 5 of the Government Exhibit 1901 (attached hereto as Exhibit A), the amount of money received by the bank accounts in Mr. Booth's name in Panama and Thailand, from only the named victims who appeared at trial, and from only the Wellcome Companies, was a total of $189,693. (We submit that the third bank account on page 5 in the United States was not sufficiently shown to have received illicit funds). From these monies, the Government did not show that all of it was received for the sole benefit of Mr. Booth, and the evidence at trial never demonstrated an extravagant expenditure or lifestyle that would suggest his receipt of the majority of those funds. We respectfully submit that although the scheme involved millions of dollars in proceeds and transactions, Mr. Booth was not shown to have personally benefited from the majority of it.

Mr. Booth is not a violent person, and was not alleged to have engaged in violent conduct. He is 68 years old, a father of two sons, and a grandfather to five young children. He has no prior criminal conduct in his life except for a non-violent conviction from more than 30 years ago. We submit that instead of prison, a non-incarceration sentence could be sufficient, but not greater than necessary, to constitute his punishment. In this regard, Mr. Booth respectfully requests a period of probation that includes 12 months of home confinement, a significant amount of community service, and other conditions that the Court deems appropriate.

Mr. Booth has already endured some of the most severe jail conditions in the country during his time in MDC Brooklyn, where he has remained remanded since April 27. Inmates at MDC have been subject to an unusually harsh lifestyle, including frequent and sustained lockdowns that cause them to be confined to their cells for multiple days at a time with limited access to showers, calls with family, supplemental food and exercise. For Mr. Booth, who is an older inmate, such conditions have been especially trying. As the PSR mentions, he suffers from chronic ailments such as high blood sugar levels, poor cardiovascular health, hypertension, and high cholesterol, and is in an age category that leaves him vulnerable to virus and sickness.

In light of the severe conditions that Mr. Booth has already sustained, we respectfully request that if continued incarceration should be deemed necessary to his sentence, that the Court offer its recommendation to the Bureau of Prisons for his placement in the minimum- security facility located in Florida, FPC Pensacola. Additionally, Mr. Booth also requests a recommendation for an alcohol treatment program.

Mr. Booth has significant support from his family. His son, Trevor, wrote a letter to the Court, contained in Exhibit B, stating "I hope my children do not have to go through their life experiences without their grandfather. My dad has a lot of knowledge and family history that needs to be passed on to the younger generation of our family."

Honorable Jed S. Rakoff, U.S.D.J.
August 4, 2022

   Mr. Booth shares his two children and five grandchildren with his ex-wife Xiomara Garcia, a retired New York City Park's patrol officer, who describes in her letter, contained in Exhibit B, how "Robert has been financially supportive throughout the years of our children's growth and encouraged their educational success. He has been a loving, responsible, and caring father." Ms. Garcia's sister, Jacqueline, writes in her letter, contained in Exhibit B, that Mr. Booth "has provided financial support and has been involved with not only his sons lives but the family in general." Additionally, Ms. Garcia's mother, Gloria Gil Garcia, states in her letter in Exhibit B, "even after my daughter and Robert separated, I am proud of his involvement with the development and growth of his children. He has been responsible and a great father."

   Among the letters contained in Exhibit B is one from his niece, Tanya Roberts, a registered nurse, who explained how "Robert being in jail took a toll for worse on his family," and "it pains me to know he won't be able to see his grandkids grow up."

   Pauline Little, a retired New York City Correction Officer of 22 years, is Mr. Booth's older sister with whom he lived in Brooklyn during the duration of the litigation of his case. Ms. Little states in her letter, contained in Exhibit B, that "the whole family loves and adores him, because he is a good and generous person. He was always there to help, assist anyone in any way he could through their challenging times. My brother would give his very last and his all, that's who he was and that's who he is. We all surely loves him." In asking for leniency, Ms. Little also writes how "this case has a great impact on my brother" and "he will not make it in prison at his age." Ms. Little's daughter, Elthea, a 21-year veteran corrections officer for New York City, writes in a letter contained in Exhibit B, that "giving his advanced age and fragile health, I am pleading with your honor to take this as well into consideration and him being an overall good person . . . so that my uncle final days will not be in prison."

   For all of the foregoing reasons, we respectfully ask the Court to consider a sentence for Mr. Booth that includes home confinement and is below the applicable sentencing guidelines.

             Respectfully submitted,

               /s

             Aaron M. Rubin
cc:             *Attorney for Robert Lenard Booth*
(ECF)
AUSA Andrew Jones
AUSA Jane Y. Chong

Robert Flemen
United States Probation Officer