

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 4, 2022

**BY ECF**

The Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Robert Lenard Booth*, S1 21 Cr. 652 (JSR)

Dear Judge Rakoff:

The defendant in this case, Robert Lenard Booth, is scheduled to be sentenced on August 11, 2022, after having been convicted by a jury of (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, (ii) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and (iii) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

The defendant masterminded a years-long fraud scheme that preyed on individual investors. For the reasons explained below, the Court should impose a term of imprisonment that is below the United States Sentencing Guidelines ("U.S.S.G.") range but is nonetheless significant and appropriately reflects the seriousness of the defendant's offense and the need to afford adequate deterrence to criminal conduct.

## I.      Background

### A.   Offense Conduct and Procedural History

From at least June 2019 through August 2021, the period charged in the Superseding Indictment, the defendant ran an international investment fraud scheme and laundered the proceeds of that fraud through overseas bank accounts. Presentence Investigation Report "PSR") ¶ 17. The scheme, orchestrated from "boiler rooms" in countries such as Thailand and Panama, involved calling potential investors around the world and using high-pressure tactics and elaborate deceptions—such as fake brokerage websites, corporate email accounts, and contracts—to trick the investors into wiring funds in exchange for what the victims believed to be legitimate securities. *Id.* ¶¶ 17-19. In fact, the funds were directed to shell company accounts used by the conspirators to launder the fraud proceeds and to distribute them among the conspirators through transactions designed to resemble legitimate business payments. *Id.* ¶ 18.

The Hon. Jed S. Rakoff
August 4, 2022

At trial, the Government adduced overwhelming evidence of the global scope of the fraud and laundering scheme, the sophisticated ruses used to gain the victims' trust, the complex coordination of the numerous bank accounts used to wash the victims' funds, the devastating effects of the fraud on the victims, and the defendant's leadership role in both defrauding investors and laundering proceeds.

Among other things, four fraud victims testified to wiring tens or hundreds of thousands of dollars to the conspirators and authenticated the websites and documentation used by the conspirators to impersonate legitimate brokerage companies (including Beekman Securities Inc.). Tr. 27-68; 162-88; 361-84; 402-23. A cooperator, Daniel Wellcome, provided detailed testimony regarding the defendant's extensive involvement in laundering the fraud proceeds; this testimony was corroborated by Wellcome's accounting logs and by bank account information recovered from a notebook and phone seized from the defendant himself during his arrest. Tr. 439-521. The defendant's phone contained other crushing evidence of the nature and extent of the defendant's participation in both defrauding victims and laundering their money, including business cards in the names of the fraudsters, recordings of conspirators pitching victims, and even the testifying victims' names and payment amounts. Tr. 237-43. Finally, the jury was provided bank records showing that at least 18 victims of the defendant's fraud scheme had paid over $1 million into bank accounts held by five shell companies in the United States, of which more than half—over $780,000—was then sent to bank accounts in Panama, Thailand, and the United States that the defendant held and controlled in his own legal names. GX 1901 (summary exhibit).

After a six-day trial, the jury convicted the defendant on all three counts of the Superseding Indictment. Tr. 820. Immediately following the defendant's conviction, the Court revoked bail and granted the Government's request for remand pending sentencing. Tr. 831.

## B.  The PSR

On July 19, 2022, the U.S. Probation Office issued the PSR. The report calculated an applicable Guidelines range of 235 to 293 months' imprisonment (the "PSR Guidelines Range") based on an offense level of 38 and a criminal history category of I. PSR ¶ 8. Probation recommends a sentence of 188 months' imprisonment (60 months on Count One and 188 months on Counts Two and Three, with all terms to run concurrently) and three years' supervised release.

Based on the evidence adduced at trial, approximately $2 million in victim losses are attributable to the defendant, *id.* at p. 20, though bank records show that total losses to the victims as a result of the conspiracy are approximately $8 million, *id.* ¶ 32.

2

The Hon. Jed S. Rakoff
August 4, 2022

## II.    Discussion

The defendant raised numerous objections to Probation's calculation of the Guidelines and recitation of the facts as set forth in the draft PSR. As explained below, none of these objections has merit. Among other things, the defendant appears to disregard the preponderance of the evidence standard that governs factual disputes at sentencing. *United States v. Najera*, No. (S1) 15 CR. 378 (PGG, 2022 WL 2802703, at *7 (S.D.N.Y. July 15, 2022). The defendant also ignores that, as a participant in a conspiracy, the defendant is "accountable for what he could reasonably have foreseen," including the reasonably foreseeable conduct of his co-conspirators. *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991).

### A.    The Guidelines Enhancements

The Government agrees with, and the evidence adduced at trial supports, Probation's application of (i) a 16-level enhancement for a loss amount between $1,500,000 and $3,5000,000 under U.S.S.G. § 2B3.1(b)(7)(I), (ii) a four-level enhancement for substantial financial hardship to five or more victims under § 2B1.1(b)(2)(B), and (iii) a three-level managerial or supervisory role enhancement under U.S.S.G. § 3B1.1(b).

### 1.    *The loss amount under U.S.S.G. §2B1.1(b)(1)(I)*

In determining a loss amount for purposes of Guidelines calculation, a district court's findings "must . . . not derive from mere speculation," but it "need not . . . establish loss with absolute precision; it need only permit the district court to make 'a reasonable estimate of the loss' given the available information." *United States v. Coppola*, 671 F.3d 220, 249–50 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)). For instance, according to Application Note 3(C), the estimate could take into account "[t]he approximate number of victims multiplied by the average loss to each victim."

Specifically, the bank records and wire details show that 18 victims paid more than $1.3 million to shell companies that in turn distributed funds to the defendant's bank accounts, and testimony and records from two victims alone, Greg Smith and Chris Chiofalo, established approximately $700,000 in additional victim funds were wired to accounts in Asia.

The defendant contends that the loss amount should be between $250,000 and $550,00 because only the four testifying victims' losses should be counted. This contention is without basis and should be rejected. The Government's evidence included bank records and wire details that show that 18 victims paid more than $1.3 million to shell companies that in turn distributed funds to the defendant's bank accounts, held in his legal names. *See* Tr. 621, GX 1901. There can be no question that the defendant can be held accountable for all $1.3 million in victim monies that passed through the shell company accounts that sent him laundered proceeds, as loss "he could reasonably have foreseen." Additional records and testimony from two victims alone, Greg Smith and Christopher Chiofalo, established that they were persuaded to wire approximately $700,000 in additional funds to accounts in Asia by fraudsters masquerading as brokers connected with Beekman Securities, the very company whose fake information was found on the defendant's phone. *See, e.g.*, Tr. 116-117, 177, 186. The approximately $2 million total is a "reasonable

The Hon. Jed S. Rakoff
August 4, 2022

estimate of the loss" attributable to the defendant. *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1 Application Note 3(C)).

The defendant also contends that the loss amount must be limited to the funds that went through the shell company accounts controlled by the testifying cooperating witness, Daniel Wellcome because the other accounts—for the sham companies GCE Holdings and Irvine Management—were "not sufficiently established to be part of the scheme." This is without merit. Among other things, the Government's IRS summary witness testified, and the underlying bank records showed, that hundreds of thousands of dollars were sent from GCE Holdings and Irvine Management to bank accounts held by the defendant in his own legal name in Thailand and the U.S. Tr. 626, 630.

### 2. *Substantial financial hardship to five or more victims under § 2B1.1(b)(2)(B)*

The defendant contends that his scheme did not result in substantial financial hardship to five or more victims. The Guidelines and the evidence say otherwise. Substantial financial hardship includes "becoming insolvent" but also "substantial loss of a retirement, education, or other savings or investment fund" or "substantial harm to [the victim's] ability to obtain credit." U.S.S.G. 2B1.1 cmt. note 4(F)(i), (iii), (vi). At trial, two of four victims testified that they lost hundreds of thousands of dollars from their savings, investment, and/or retirement funds to the defendant's fraudulent investment scheme, and a third described taking out lines of credit to fund his stock purchase from the fraudsters. *See, e.g.*, Tr. 133 (testimony from Christopher Chiofalo regarding loss of life savings); Tr. 163-68 (testimony from Gregory Smith regarding transfer of investment funds to fraudsters); Tr. 419-20 (testimony from Franco Cesta regarding taking out lines of credit and putting lien on property).

The bank records introduced at trial regarding the remaining 14 victims, who lost between $7,000 and $500,000 each, GX 1901, allows for the reasonable inference that at least two suffered substantial financial hardship as defined under Application Note 4(F).

### 3. *Manager or supervisor under U.S.S.G. § 3B1.1(b)*

The evidence at trial established that the defendant served, at the very least, as a manager or supervisor in a conspiracy involving five or more participants.

First, there is no serious dispute that the conspiracy involved five or more participants. For example, testimony and wire transfers showed that the defendant's laundering partner, Wellcome, worked with a launderer based in the United States, Michael D'Urso, and additional launderers. Tr. 437, 592. In addition, the defendant's phone contained the defendant's texts with "Triple A Jay," who handled fraudulent paperwork; Tr. 709; audio recordings from a nameless conspirator requesting feedback on his fake stock pitches, Tr. 712; a call script sent through WhatsApp from "JD32," Tr. 712, and evidence of communications exchanged with and connections to other conspirators.

The leadership enhancement is warranted where a defendant "managed just one other person." *United States v. Baptiste*, No. 15-CR-00854 (SHS), 2022 WL 2663479, at *3 (S.D.N.Y.

The Hon. Jed S. Rakoff
August 4, 2022

July 11, 2022). Without question, it is warranted here. Among other things, the defendant's phone contained audio recordings and text communications from conspirators seeking advice from the defendant and payment for their calls to victims. GXs 103E, 103G, 103I, 104, 104A, 104B, 104C, 104D, 104J. One recording of the defendant's voice, introduced at trial, depicted the defendant demanding money from Wellcome so that the defendant could "pay [his] people." As Wellcome spelled out for the jury during his cross-examination, "If you listen to [the defendant's] other recordings, it's 'I have to pay my people,' and that's obviously his workers." Tr. 555.

### B.  Factual Disputes

The defendant also objects, without basis, to a number of facts included in the PSR. But as a starting matter, the PSR properly includes comprehensive information about the offense conduct in this case and the nature and extent of the defendant's scheme. Because "the principal purpose of the presentence report is to provide the court with information facilitating the meaningful exercise of its sentencing discretion, [i]n order to be of greatest assistance to the court, the report should be as complete as possible, containing [a]ll objective information which is significant to the decisionmaking process." *Dorman v. Higgins*, 821 F.2d 133, 137 (2d Cir. 1987) (citation and internal quotation marks omitted). Simply put, "there are no formal limitations on the report's contents." *Id.*

The defendant's contentions also rely on an inaccurate representation of the facts, as detailed in brief below.

Paragraph 17: The defendant objects to the PSR's reference to the money-laundering co-defendants who worked with Daniel Wellcome and Michael D'Urso to receive and launder the victims' funds—Jay Garnock, Antonella Chiaramonte, and Alyssa D'Urso—on the grounds that they have not yet been convicted and because "none of them were referenced by any evidence at Mr. Booth's trial." The first statement is irrelevant and the second is untrue. Although the names of these individual money launderers were not a necessary point of focus at trial, the jury was, without question, presented with their names and their roles in the conspiracy. The evidence included testimony from Wellcome about the fraudsters' establishment of specific shell companies and corresponding bank accounts to launder the funds. Tr. 450-52. The Government's exhibits, in turn, included signature cards for those shell company bank accounts, which clearly bear the printed names and signatures of Garnock, Chiaramonte and D'Urso. *See* GXs 1001, 1004, 1007, 1012 (four bank signature cards for  ATC Holdings, signed by Antonella Chiaramonte); GXs 1101, 1103, 1108 (three bank signature cards for DT Holdings, signed by Jay Garnock); GXs 1201, 1301, 1304 (three bank signature cards for BA Management, signed by Alyssa D'Urso).

Paragraphs 17, 20 and 26: The defendant objects to reference to Jerome Austin's involvement in the fraud scheme. But Austin has pleaded guilty to the securities fraud and wire fraud conspiracies, in addition to making false statements. The defendant's insistence that Austin is "not credible," apparently even as to Austin's admissions of his own guilt, should be rejected.

PSR Paragraph 19. The defendant contends that the evidence did not adequately establish that the defendant worked "to call investors." Again, the defendant is wrong. Among other things,

The Hon. Jed S. Rakoff
August 4, 2022

the victims testified that some of the fraudsters identified themselves on the phone under the names "Robert Miller" and "John Sommer," Tr. 35, 67, 363, 427, and fake business cards in those names were recovered from the defendant's phone, Tr. 237. The Government also presented to the jury evidence that the callers worked in teams, including an audio recording recovered from the defendant's phone in which a co-conspirator informs the defendant that a potential investor is "in the palm of our hands" and "the rest is up to you." Tr. 714. The jury could fairly infer from this evidence that the defendant was the follow-up caller.

PSR Paragraphs 24, 25 and 32. The defendant disputes the loss amount and reference to the defendant's leadership role in the scheme. These arguments are groundless for the reasons already discussed above in connection with the applicable sentencing enhancements.

### C.  The Need for a Significant Sentence

The Government recognizes that where the Guidelines range may be unduly inflated by a large loss amount, the statutory factors set forth in Section 3553(a) may provide a more appropriate basis for the sentence. *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (JSR), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Here, the Section 3553(a) factors weigh in favor of a significant term of incarceration, particularly given the evidence presented at trial establishing the defendant's remorseless predation on individual victims over the course of years.

*First*, a significant sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The offense conduct is egregious and speaks to the defendant's abject greed and disregard for the lives of his victims. The defendant masterminded a sophisticated operation that specifically targeted unsophisticated investors. *See* Tr. 150 (Robert Solomon's testimony regarding obvious red flags on the fraudulent Beekman Securities website). Further, the tactics deployed by the defendant to perpetrate his fraud maximized these victims' financial and emotional damage: he and his co-conspirators established personal relationships with the victims through months or even years of phone calls in order to persuade them to make payment after payment, often resulting in a single victim's loss to the tune of hundreds of thousands of dollars. *See, e.g.*, Tr. 61. In this way, the scammers fleeced their victims of their life savings and destroyed their victims' prospects of recovering from the fraud.

For example, Franco Cesta, a disabled grader and tallyman living on worker's compensation, testified that he not only wired all of his savings to the fraudsters who ran the Beekman Securities website and related websites, but also spent a month arranging a loan and putting a lien on his property in order to make an additional $110,000 investment. Tr. 420, 722. Other victims, in written statements that are attached to this submission, described the many ways the defendant stole their savings and shattered their plans to care for family members, build a business, or have a home.[1] The havoc the defendant wreaked on his victims' lives was more than financial, and the defendant caused immense psychological and emotional harm from which his victims are still recovering. This is a case in which "the 'utterly despicable' way [the defendant] preyed on unsophisticated investors" should be factored into the sentence. *United States v.*

---

[1] The victim statements received to date are attached in redacted form as Exhibit A.

The Hon. Jed S. Rakoff
August 4, 2022

*Jaramillo*, 754 F. App'x 61, 62 (2d Cir. 2019) (affirming above-Guidelines sentence in commodities fraud and wire fraud case); *United States v. Schlisser*, 767 F. App'x 69, 72 (2d Cir. 2019) (affirming above-Guidelines sentence more than twice the high end of the applicable range based in part on the financial hardship the defendant caused his victims).

*Second*, a substantial sentence is necessary to protect the public from further crimes of the defendant and to reflect the history and characteristics of the defendant. Although the defendant does not have a recent criminal record, the evidence at trial established that, for years, he played a role in managing other co-conspirators in the fraud; communicated with and preyed on specific victims; and personally reaped hundreds of thousands of dollars in victim funds. *See United States v. Harris*, 689 F. Supp. 2d 692, 696 (S.D.N.Y. 2010) ("The magnitude of fraud and [the defendant's] role as its architect count against him[.]"); *United States v. Gupta*, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (JSR), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (distinguishing between working an unfairness on innocent investors and defrauding investors, and disapproving loss amount where the defendant "did not share in any direct sense"). It should be noted that the defendant is not similarly situated with an insider trader or other fraud defendant who creates unfairness within the financial system but does not set out to harm particular individuals. The defendant and his co-conspirators compiled lists of potential victims, contacted them, built relationships with them, manipulated them, and repeatedly defrauded them, extracting from some almost everything they had.

*Third*, a substantial sentence is necessary to afford adequate deterrence to the defendant and others similarly situated. *See* 18 U.S.C. § 3553(a)(2)(B). Achieving a deterrence effect is particularly important here, where nothing suggests the defendant was motivated by financial desperation. To the contrary, the evidence at trial indicated that the defendant's elaborate scheme to deceive investors out of their hard-earned life savings and wash his ill-gotten gains allowed him to bankroll a lavish lifestyle. *See, e.g.*, GXs 102A (defendant and BMW), 102M (first-class flight); 105L (massage chair). As to general deterrence, a significant sentence would send a message to others involved in similar boiler room schemes or considering the exploitation of innocent investors that such conduct carries serious consequences.

### D. Forfeiture and Restitution

The defendant's conviction, in addition to demanding a significant sentence of imprisonment, requires the Court to impose orders for forfeiture and restitution. *See* 18 U.S.C. §§ 981, 982, 3663, 3663A; 28 U.S.C. § 2461(c). The Court should impose a money judgment against the defendant in the amount of $780,981.86 and order that he forfeit the specific bank accounts that the defendant used to collect and launder the money he stole from victims of the scheme. The Government is submitting a separate memorandum describing the legal basis and rationale for the proposed forfeiture order.

Additionally, the Court must order the defendant to pay restitution to his victims for the losses that he caused. *See United States v. Moss*, No. 17 CR. 675 (JSR), 2021 WL 3222514, at *2 (S.D.N.Y. July 29, 2021). Here, that requires an order for restitution in the amount of $2,003,883. This amount is equal to the losses suffered by victims of the defendant's fraud scheme, as reflected

The Hon. Jed S. Rakoff
August 4, 2022

from the documents and testimony at trial and captured in the proposed restitution schedule that will be submitted under seal.

### III.    Conclusion

For the reasons set forth above, the Government respectfully submits that a significant sentence of imprisonment would be fair and appropriate in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    _____/s/_____
Andrew Jones
Jane Chong
Assistant United States Attorneys
(212) 637-2249/2263

cc: Aaron Rubin, Esq. (counsel for defendant), by CM/ECF