```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>ROBERT LENARD BOOTH,<br><br>Defendant. | 21-cr-652 (JSR)<br><br>MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.:

Following a one week trial, a jury convicted defendant Robert Lenard Booth of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering. Dkt. 76. At trial, the Government introduced evidence that Booth participated in a "boiler room" scheme through which Booth and various co-conspirators stole nearly $2 million from victims and transferred the proceeds through New York banks. Booth moves for a judgment of acquittal or a new trial, arguing that the Government failed to adduce evidence establishing venue in this district, that the Government improperly relied on evidence from an unreliable co-defendant, and that the evidence adduced at trial was insufficient to sustain a conviction on all counts. Def. Mem. Supp. Mot., Dkt. 105 ("Def. Mem.") at 3-17; see Fed. R. Crim. P. 29, 33. For the reasons set forth below, the Court denies Booth's motion.

I. **Legal Standard**

Federal Rule of Criminal Procedure 29 requires a district court, upon the defendant's motion, to "set aside the verdict and enter an

1

acquittal" for any offense "for which the evidence is insufficient to sustain a conviction." "A defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011). This means that "[t]he conviction must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Persico, 645 F.3d 85, 105 (2d Cir. 2011) (quotations omitted) (emphasis in original). The Court evaluates the evidence underlying a conviction "in conjunction, not in isolation." Id. at 104 (quotations omitted).

Federal Rule of Criminal Procedure 33(a) empowers courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Here too, a defendant "bears the burden of proving that he is entitled to a new trial under Rule 33," and a court should order one only in "extraordinary circumstances" where there is some "real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (quotations omitted).

II. **Analysis**

> *A. The Government adduced sufficient evidence to establish venue in this District.*

Booth first moves for acquittal or a new trial on the basis that the Government failed to establish venue in this judicial district. Def. Mem. at 4-8. 18 U.S.C. § 3237 authorizes prosecutions for offenses

2

against the United States to be brought in "any district in which such offense was begun, continued, or completed." See United States v. Royer, 549 F.3d 886, 894 (2d Cir. 2008) (noting that venue is proper in any district in which a defendant knowingly or intentionally causes an act in furtherance of the offense to occur, or in any district in which it is foreseeable that such an act could occur and where it subsequently does). Here, the Government sought to prove venue by establishing that money taken from Booth's victims was transferred through banks located in Manhattan, and the Court instructed the jury on that basis. See Trial Transcript ("Tr."), Dkt. 87, at 812:10-13. Booth does not appear to dispute that this would constitute a sufficient basis for venue if proved. Def. Mem. 4 n.2 (citing United States v. Ho, 984 F.3d 191, 307 (2d Cir. 2020), which contemplates that transfers of money "through correspondent banks" may give rise to venue).

Instead, Booth argues that the Government failed to offer sufficient admissible evidence showing transfers through Manhattan banks because: (1) the exhibits documenting these transfers were prepared for litigation and were therefore not business records and were admitted in violation of Booth's confrontation clause rights, Def. Mem. 6, (2) these exhibits were insufficient to demonstrate venue by a preponderance of the evidence, Def. Mem. 7, (3) IRS Agent Rauseo, who testified about these exhibits, lacked sufficient personal knowledge or qualifications as an expert to testify as to their contents, Def. Mem. 5, and (4) Booth was prejudiced by unsupported

3

arguments in the Government's summation and the absence of a specific venue jury instruction, Def. Mem. 8. Each argument lacks merit.

<u>First</u>, Booth is wrong that the admission of various spreadsheets[1] as business records was in error or implicates his rights under the confrontation clause. Though Booth argues that "[t]he spreadsheets were specifically prepared by the banks for the purpose of the case and responding to a subpoena," Def. Mem. 6, they were not "prepared" for this litigation in any meaningful sense. Rather, testimony from bank custodians established that the spreadsheets were genuine business records kept by the relevant banks as part of their ordinary course of business, and the only actions taken in anticipation of litigation were to export, without alteration, a subset of the data contained in voluminous electronic databases such that only those records pertaining to a particular individual were produced. Tr. 291:2-292:3 (explaining this "purely ministerial" process). <u>See also</u> Tr. 302, 306-08, 312-13, 343-44, 345-46.

Because these spreadsheets consist solely of information "kept in the course of a regularly conducted activity of a business," they were properly admitted under the business-records exception to the rule against hearsay. Fed. R. Evid. 803(6)(B). <u>See also</u> <u>Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.</u>, 38 F.3d 62, 632 (2d Cir. 1994) ("A business record may include data stored electronically on

---

[1] Specifically, Booth points to Government Exhibits 801, 802, 804, 806, 1009, 1105, 1203, 1306, 1412, 1413, 1003, 1303, 1407, and 1502. Def. Mem. 6.

computers and later printed out for presentation in court, so long as the 'original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice.'" (quotations omitted)); id. at 633 (noting that "a downloading of information previously computerized in the regular course of business" is permissible); Health Alliance Network, Inc. v. Continental Cas. Co., 245 F.R.D. 121, 129 (S.D.N.Y. 2007) (rejecting the suggestion that otherwise unaltered data that has been "culled from [a business's] database using a query" no longer constitute business records kept in the ordinary course).

For the same reasons that these spreadsheets qualify as business records under Rule 803(6)(B)'s hearsay exception, they cannot plausibly be characterized as "testimonial" statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at later trial." Crawford v. Washington, 541 U.S. 36, 52 (2004). As such, their admission did not violate Booth's rights under the confrontation clause. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) (explaining that "[b]usiness and public records are generally admissible absent confrontation . . . because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial").

Second, these spreadsheets and other evidence properly introduced by the Government sufficiently supported the inference that wire transfers in furtherance of Booth's conspiracy passed through

5

Manhattan banks. Several of the spreadsheets list transactions between banks, with Manhattan addresses listed for the "debit party" banks. See, e.g., Gov't Ex. 1306. Though Booth asserts that it would somehow be "counter-intuitive" to conclude that these transfers--from Thailand to Long Island--passed through banks based in Manhattan, the Government's evidence clearly gave rise to that unremarkable inference.[2] See United States v. Temple, 447 F.3d 130, 136-37 (2d. Cir. 2006) (requiring, in the context of a Rule 29 motion following a guilty verdict, that the court "credit[] every inference that the jury might have drawn in favor of the government").

Third, Booth is wrong to argue that the Government's summary witness, IRS Agent Rauseo, "lacked the expertise or personal knowledge" to state that these bank records showed transfers through Manhattan-based banks. Def. Mem. 6. For one thing, as described above, the exhibits introduced by the Government sufficed by themselves to provide a basis upon which the jury could reasonably find venue, with or without Rauseo's testimony. For another, Rauseo's statements that the bank "debit part[ies]" documented across the Government's numerous

---

[2] The Government also points to its exhibit 1901, which contains a summary chart prepared pursuant to Fed. R. Evid. 1006, summarizing ten transactions involving victim payments that passed through Manhattan banks before being transferred to various shell companies. See Gov't Ex. 1901. Booth did not object to this exhibit when it was introduced, Tr. 621:20-622:3, although he did object to the admission of several of the underlying exhibits on which it was based. In any event, the Government's Exhibit 1901 merely summarizes what its other exhibits show, albeit at greater length: that transfers from victims in furtherance of Booth's conspiracy passed through Manhattan.

exhibits were correspondent banks through which the transfers in question passed were not statements of opinion based on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702, but rather a straightforward description of the documents in front of him requiring little technical knowledge beyond familiarity with the everyday terms "credit" and "debit." See Tr. 676:20-25.

Fourth, Booth was not prejudiced by any references the Government made in summation to New York contacts other than the bank transfers, or by the absence of the inclusion of venue on the verdict form. Def. Mem. 7-8. Though the Government made a brief reference to the use of fake New York addresses, Tr. 731:5-12, the bulk of its argument as to venue clearly related to the wire transfers through Manhattan banks, Tr. 730:14-731:2, Tr. 780:8-781:11. The Court then specifically instructed the jury that the basis for finding venue was "the government's allegation . . . [that] money transferred through banks in Manhattan." Tr. 812:10-13. The Court also instructed the jury that, in order to find Booth guilty, it must find that some "act in furtherance of the crime you are considering occurred in the Southern District of New York." Tr. 812:6-9. Booth offers no reason to think that the jury relied on any putative New York contacts other than the wire transfers, nor any reason to think that the unremarkable absence of a dedicated venue box on the verdict form caused the jury to ignore the Court's venue instruction. See Emamian v. Rockefeller Univ., 971 F.3d 380, 390-91 (2d Cir. 2020) (noting district courts' broad discretion in formulating the verdict form).

7

For the foregoing reasons, the Government adequately demonstrated and the jury reasonably found that venue existed in this district.

  B. *The Government's references to Booth's co-defendant were not improper.*

Booth's next argument relates to the Government's evidence and statements regarding Booth's co-defendant, Jerome Austin, who, the Government stated in its opening, would testify at trial, but whom the Government ultimately declined to call after discovering various credibility issues relating to him. Def. Mem. 8-15. While not entirely clear, the thrust of Booth's argument appears to be that the Government improperly described Booth to the jury as a leader or "mastermind" of the conspiracy, when its basis for so believing was evidence that it had previously obtained from Austin but later determined was not credible. Id.

Even assuming that the Government's sole basis for referring to Booth as a leader or "mastermind" of the conspiracy was Austin's anticipated testimony, it remains unclear what legal error was caused by the Government's describing Booth as a leader or mastermind to the jury. Booth was not charged with being the "mastermind" behind the conspiracy; he was charged with and convicted of specific counts of conspiracy based on the evidence adduced at trial. The Court instructed the jury that "nothing that counsel says is evidence," Tr. 5:7, and Booth offers no reason to think that the Government's references to Booth as having run or masterminded the scheme improperly influenced the jury's verdict.

Moreover, Booth is wrong to suggest that the only evidence showing that Booth "masterminded" the fraud came from Austin. Another witness and participant in the scheme, Daniel Wellcome, testified that Booth "is the mastermind behind" the scheme, Tr.551:7-11, and Booth's assertion that Wellcome lacked a basis to credibly assert as much is belied by ample record evidence. Wellcome testified in detail, for instance, to having sent the money he received from defrauded individuals to accounts in Mr. Booth's name. Tr. 479:16-481:13, 552:17-23. The Government introduced accounting logs maintained by Mr. Wellcome that specifically identify Booth by name as the responsible person for transactions involving specific victims, Gov't Exs. 15-19, 401-05, as well as voicemails Booth left on Wellcome's phone discussing their participation in the scheme and directing Wellcome to send money that Booth needed to pay others, Gov't Exs. 303A, 302K, 302L, 302N. Mr. Wellcome aside, moreover, Booth's cellphone contained further evidence of his role in the scheme, including screenshots of the website used to deceive investors, Gov't Ex. 102P, audio recordings of sale pitches to potential victims, Gov't Exs. 103E, 103F, 103G, 104C, 104G, 104M, 104P, 104Q, 104T, 104Z, 104BB, confirmations of wire transfers between victims and members of the conspiracy, Gov't Ex. 102C, 102D, phony business cards for the putative employees of the fraudulent investment firms described to victims, Gov't Ex. 105J, a sales script used by a co-conspirator to defraud investors, and text messages that identified testifying victims by names and by the amount of money they lost, GX 105I. There was therefore ample evidence before

9

the jury that would support both a guilty verdict and the Government's contentions that Booth played a leadership role in the scheme.

Booth also appears to argue that the Government knowingly misled the jury by referring to Austin in its opening, and by referring to evidence putatively derived from Austin in its summation, when it had determined Austin was not credible. Def. Mem. at 10-13. Of course, prosecutors should never "mak[e] knowing use of false evidence," or knowingly mislead the jury in an opening, summation, or other comments. United States v. Salameh, 152 F.3d 88, 133-34 (2d Cir. 1998). But Booth offers no reason to think that happened here.

As described above, ample evidence supported the Government's argument that Booth played a leadership role in the fraud, with or without any help from Austin. As for the Government's reference to Austin in its opening, the Government claims that it intended to call Austin to testify, and only subsequently chose not to do so after receiving new information regarding Austin's participation in a separate fraudulent scheme. Gov't Mem. Opp. Def. Mot., Dkt. 109, at 11. Booth offers no reason to dispute this account.

Booth also claims he was prejudiced when the Government suggested on summation that he might have been "Robert Miller," a fake name given to fraud victims when encouraging them to invest, and which Austin putatively would have testified was none other than Booth. Def. Mem. 13. But the fact that Austin was not called does not preclude the Government from suggesting facts that Austin might have testified to. See Salameh, 152 F.3d at 133 (describing the government's "broad

10

latitude in the inferences it may reasonably suggest to the jury during summation" (quotations omitted)). And, in any event, the relevant piece of the Government's summation, in which the Government suggested that "the fraudsters worked in teams," and that "the defendant is the Robert Miller or the Robert Nolan or the Neil Matthews described by victims," is best read as a statement that Booth assumed one or more aliases in connection with the fraud, rather than a specific assertion that Booth and "Robert Miller" were at all times the same.

As important, Booth offers no reason to think he was prejudiced by any reference to Austin or to evidence derived from Austin. To the contrary, Booth was free to and did argue to the jury that the Government's failure to produce Austin after specifically calling him out in its opening cast doubt on its case. Tr. 769:6-10. That the jury did not accept this argument only goes to show that it believed there was a sufficient basis to convict Booth absent Austin's promised testimony.

    C. *There was sufficient evidence to support the verdict on all counts.*

In the last two pages of his brief, Booth briefly argues that there was insufficient evidence to sustain a conviction on all counts, because "none of the four victim investors at trial testified that Mr. Booth had defrauded them," and there was "insufficient evidence to show that Mr. Booth caused the investors' funds to be transferred to the shell companies controlled by Daniel Wellcome." Def. Mem. 15-16. But, as discussed above, there was ample

11

evidence from witness testimony, including from Wellcome, and other evidence, such as the evidence found on Booth's phone, that Booth knowingly operated and directed others in a boiler room scheme and that he conspired with Wellcome to launder the proceeds by sending stolen money to his bank accounts. This evidence greatly exceeded what would be needed to let stand the jury's verdict.

III. **Conclusion**

    For the foregoing reasons, the Court hereby denies Booth's motion under Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal or for a new trial.

    SO ORDERED.

New York, NY  
August 4, 2022

                                            JED S. RAKOFF, U.S.D.J.